## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

JACKIE LANE,
on behalf of herself and all others similarly situated,

                    Plaintiff,

v.                                         CIVIL ACTION NO. 3:23-0380

ALTICE USA,
CEBRIDGE ACQUISITION, LLC,
CEQUEL III COMMUNICATIONS, I, LLC, and
CEQUEL III COMMUNICATIONS, II, LLC,
doing business as Optimum formerly known as Suddenlink,

                    Defendants.

## MEMORANDUM OPINON AND ORDER

        Pending is a Renewed Motion to Compel Arbitration and to Stay Litigation by

Defendants Altice USA, Cebridge Acquisitions, LLC, Cequel III Communications, I, LLC, and

Cequel III Communications, II, LLC, doing business as Optimum formerly known as Suddenlink

(collectively referred to as "Suddenlink").[1] ECF No. 31. Plaintiff Jackie Lane opposes the motion.

For the following reasons, the Court **DENIES** the motion **WITHOUT PREJUDICE**.

## I.
## FACTUAL AND
## PROCEDURAL BACKGROUND

        This renewed motion for arbitration and stay is before the Court following a prior

Memorandum Opinion and Order denying a similar motion without prejudice. As more fully

explained in this Court's earlier decision, Plaintiff is pursuing a class action against Suddenlink

---

[1]Although Suddenlink is now known as Optimum, the Court will continue to refer to the collective Defendants as Suddenlink for purposes of this Memorandum Opinion and Order.

related to certain fees and taxes Suddenlink adds to consumers' bills, which she claims violates the West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-2-101, *et seq. Lane v. Altice USA*, Civ. Act. No. 3:23-0380, 2024 WL 780440, *1 (S.D. W. Va. Feb. 26, 2024). In the Court's previous decision, it determined there was a genuine issue of material fact over whether the parties entered into an arbitration agreement. *Id.* at *6. In particular, the Court noted that Suddenlink had modified its Residential Service Agreements (RSAs) several times since Plaintiff had signed up for service in 2011, and the Court was unable to ascertain which, if any, of these RSAs applied to her and required arbitration. Given the lack of clarity, the Court found there were at least three potential scenarios for the parties to explore in discovery.

First, the Court indicated it did not know whether Plaintiff had agreed to an RSA with a binding arbitration provision in 2011 as that information was not provided. *Id.* at *5. If she did, the Court found that an email sent to Plaintiff on June 14, 2022, "unmistakably notified [her] it was amending the arbitration provision effective July 20, 2022, and it provided [her] a hyperlink to access the provision." *Id.* (citation omitted).[2] Therefore, under this scenario, "the Court would find the July 20, 2022 RSA would be the operative agreement." *Id.* (footnote omitted).

---

[2]The email provided, in part:

### An update to our Terms of Service.

We're updating the Binding Arbitration provision of our Residential Services Agreement, effective July 20, 2022. You can access and read the updated arbitration provision at www.suddenlink.com/residential-services-agreement.

Thanks for being a loyal Suddenlink customer.

*Email from Suddenlink* (June 14, 2022), ECF No. 10-1, at 5. The email also provided links to a subscriber's account information and to access support and messaging. *Id.*

Second, the Court stated that, if Plaintiff never entered into an RSA with Suddenlink prior to 2019, "the issue becomes whether Plaintiff's payment of her bill was sufficient to *create* a binding agreement between the parties." *Id.* at *5 (italics original).[3] If a binding agreement was created, Plaintiff would have agreed to arbitration as it was included in 2019 RSA. *Id*. (citation omitted).[4] Additionally, as with the first scenario, the Court reiterated that the email sent on June 14, 2022, "provid[ed] Plaintiff with reasonable notice that the agreement was revised effective July 20, 2022. Therefore, . . . the 2022 RSA would be operative." *Id.*

Lastly, the Court hypothesized about a third potential scenario in which an RSA existed between the parties prior to 2019, but the RSA did not contain an arbitration provision. In that situation, and assuming the billing statements sent to Plaintiff were "insufficient to modify the terms of the original agreement" as found in *Gooch v. Cebridge Acquisition, LLC*, Civ. Act. No. 2:22-00184, 2023 WL 415984 (S.D. W. Va. Jan. 25, 2023),[5] the Court found there would be no binding arbitration agreement between the parties because "the June 14, 2022 email alerting Plaintiff that it was updating the RSA's Binding Arbitration provision would not be relevant to her as there never was an arbitration agreement between the parties that could be updated." *Id*. at *6.

Given that there were at least three different scenarios, the Court was unable to determine from the record before it whether Plaintiff was subject to enforceable arbitration

---

[3]In the Court's earlier decision it noted that "Suddenlink submitted copies of [Plaintiff's] billing statements from September 2019 through September 2023[.]" *Id.* at *2.

[4]Whether any of the arbitration provisions is enforceable is a separate issue.

[5]*Gooch* currently is on appeal to the Fourth Circuit.

agreement or not. As it is this Court's gatekeeping responsibility under 9 U.S.C. § 4 to decide if

an arbitration agreement exists, the Court denied Suddenlink's motion so the parties could conduct

discovery on the issue of contract formation. *Id.* Suddenlink now has renewed its motion, but the

parties disagree about what discovery shows.

## II.
## STANDARD OF REVIEW

Section 4 of the Federal Arbitration Act (FAA) makes it clear that it is the

responsibility of the courts as a threshold issue to rule on contract formation as a party cannot be

forced into arbitration if an agreement to arbitrate was never reached. *Rowland v. Sandy Morris*

*Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021). "'Arbitration is' after all, 'a

matter of contract,'" and ordinary state contract law principles apply. *Id*. (quoting *Rent-A-Center,*

*West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010); also citing *Chorley Enters., Inc. v. Dickey's*

*Barbeque Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015)). In applying this gatekeeping role, the

court applies the summary judgment standard, and it is the defendant's burden to "'establish[ ] the

existence of a binding contract to arbitrate the dispute.'" *Id*. (quoting *Minnieland Private Day Sch.,*

*Inc. v. Applied Underwriters Captive Risk Assurance Co.*, Inc., 867 F.3d 449, 456 (4th Cir. 2017)).

If, however, there is a genuine issue of material fact as to whether an arbitration agreement exists,

"the 'court shall proceed summarily' and conduct a trial on the motion to compel arbitration."

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019).

## III.
## DISCUSSION

In Suddenlink's renewed motion pending before the Court, it attaches two affidavits

that it argues proves an arbitration agreement exists between the parties. In its first affidavit, Travis

Lucas states he has been employed in various positions with Suddenlink since 1996 and is a current

Director of Operations Field Service for this region. *Travis Lucas Aff.* ¶2 (May 23, 2024), ECF No. 31-1. He also states he is familiar with Suddenlink's installation and activation processes, billing statements, and "corporate records related to customers' installation, activation, and cancellation of Suddenlink service[.]" *Id.* ¶¶3-4. Mr. Lucas further averred that:

> [a]s a matter of routine business practice at the time of Ms. Lane's order and installation of Suddenlink services in September 2011, the field services technician was required to present Ms. Lane (or her authorized representative) with a mobile device running an application called ETADirect. The application contained several screens that Ms. Lane or her authorized representative was required to interact with in order to complete the installation and activate their service.

*Id.* ¶6. According to Mr. Lucas, the mobile device displayed the entire "text of the then-current RSA in a box that the customer was required to scroll through before entering a signature to complete the installation process." *Id.* ¶7, in part. In order to have service installed, Plaintiff or her authorized representative was required to sign the "device under a series of acknowledgments that included," *inter alia*, that she agreed to the RSA and acknowledged that the RSA "CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." *Id.* (capitalization original). Mr. Lucas attached a screenshot of that specific provision to his affidavit. *See Acknowledgement of RSA and Binding Arbitration*, ECF No. 31-1, at 5.[6] Suddenlink also submitted the affidavit of William Heberer, who is employed by Suddenlink as Senior Vice President, Legal, who attached a full copy of the RSA in effect in 2011. *William Heberer Supp. Aff.* ¶1 (May 23, 2024), ECF No. 31-2.

---

[6]Although not significant to the present decision, the Court notes, as does Plaintiff, that this provision is written under a heading entitled "NOTICE REGARDING 911 SERVICES." *Id.*

In light of Mr. Lucas's affidavit and the RSA in effect in 2011, Suddenlink argues the evidence shows that Plaintiff (or her authorized representative) was required, as part of its regular business practice, to have signed the mobile device after she scrolled through the screens containing the RSA with the arbitration provision before the field services technician was permitted to complete installation and activate her services. Suddenlink insists this business practice establishes that an agreement to arbitrate was formed in 2011, and the parties agreed to arbitration as the 2011 RSA plainly states that "ALL DISPUTES OR CLAIMS"[7] between the parties are to be resolved through arbitration. Additionally, Suddenlink maintains that, as the Court already determined under this first scenario that the June 14, 2022 email unequivocally notified her of an amendment to the arbitration provision, the July 20, 2022 RSA is the operative agreement. That agreement provides, in part: "**YOU AGREE TO ARBITRATE YOUR DISPUTE AND TO DO SO ON AN INDIVIDUAL BASIS; CLASS, REPRESENTATIVE, AND PRIVATE ATTORNEY GENERAL ARBITRATIONS AND ACTIONS ARE NOT PERMITTED**." 2022 *RSA* ¶24(i) (capitalization and bold original), ECF No. 10-3, at 65.

On the other hand, Plaintiff argues Suddenlink's motion is doomed because, although it maintains its system "captures" electronic signatures, it has failed to meet its burden of showing she ever entered into the 2011 agreement by producing an RSA her signature on it. Additionally, Plaintiff points out that neither of the affiants claim to have any direct knowledge of the field services technician interactions with her, Suddenlink did not offer any eyewitness evidence that she actually was shown the mobile device, and it has failed to produce any

---

[7]2011 *RSA* ¶20 (capitalization original), ECF No. 31-2, at 6. According to Suddenlink, the RSA in effect in 2011 was implemented on May 15, 2010. *Heberer Supp. Aff.* ¶3.

screenshots of what was purportedly presented to her. In reply, Suddenlink insists its evidence is sufficient under Rule 406 of the Federal Rules of Evidence[8] because it was its routine business practice to have consumers sign mobile devices and Plaintiff had to sign the mobile device in order for services to be installed. Upon review, the Court finds the evidence inadequate.

Although not cited by the parties, the Court finds the Fourth Circuit's decision in *Hill v. Employee Resource Group, LLC*, 816 Fed. Appx. 804 (4th Cir. 2020) (per curiam), particularly instructive. In *Hill*, the defendant appealed an order denying its motion to enforce arbitration for certain potential class action plaintiffs for whom the defendant was unable to produce signed arbitration agreements. 816 Fed. Appx. at 805.[9] On appeal, the defendant "primarily reli[ed] on two pieces of evidence in arguing it [had] demonstrated, as a matter of law, that an arbitration agreement exist[ed]," even though they could not find signed arbitration agreements. *Id.* at 809. First, the defendant submitted an affidavit from its Director of Human Resources, in which he stated that all employees, without exception, "were required to review, agree to, and sign the arbitration acknowledgment form" as part of their onboarding process and managers were trained to ensure compliance. *Id.* Second, the defendant argued it was able to produce a large number of signed agreements which is strong evidence that everyone signed one. However, the Fourth Circuit rejected both these theories.

---

[8] Rule 406 provides: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness." Fed. R. Civ. P. 406.

[9] The district court granted the motion to enforce arbitration as to those for whom signed agreements were produced. *Id.* at 806.

As the class action was filed in West Virginia, the Fourth Circuit recognized that West Virginia state law requires a "high degree of proof from one seeking to establish a lost instrument . . ., with the proponent of a lost or missing instrument needing to prove its existence and contents with clear and conclusive evidence." *Id.* at 808 (internal quotation marks and citations omitted). [10] Applying the summary judgment standard through this lens, the question to be resolved was "whether the evidence in the record could support a reasonable jury finding that [the defendant] has proven by 'clear and conclusive evidence' . . . that an agreement to arbitrate exists between the parties." *Id.* at 809 (citations omitted).

Upon consideration of the defendant's evidence, the Fourth Circuit concluded that the affidavit from the defendant's Director of Human Resources was insufficient. The Fourth Circuit found a corporate official's expectation and assumptions that a company policy requiring employees to sign an arbitration provision as part of the onboarding process "is of little probative value." *Id.* Nearly all companies have policies that they hope are enforced, but it does not mean it always happens. Thus, absent "testimony from those individuals that had first-hand knowledge of the onboarding process," a corporate official's affidavit providing that all employees are required to sign an arbitration agreement "does little to prove the existence of" those that cannot be found. *Id.*[11]

---

[10]The action also included plaintiffs from Kentucky, Ohio, and Virginia.

[11]The Fourth Circuit distinguished *Banks v. Mitsubishi Motors Credit of America, Inc.*, 435 F.3d 538 (5th Cir. 2005), relied upon by the defendant. The Fourth Circuit recognized that *Banks* applied a preponderance of the evidence standard under Mississippi state law, which was lower than what is required in West Virginia. In addition, the evidence submitted by the defendants in support of their claim that missing arbitration agreements were signed was an affidavit from an auto dealership president who explained that a customer could not purchase a vehicle without signing an arbitration agreement. *Id.* at 810. The Fourth Circuit found the affidavit submitted in

Additionally, the Fourth Circuit found the defendant did not prove by clear and convincing evidence that all the employees must have signed agreements based on the defendant being able to locate other employees' signed agreements. The Fourth Circuit stated the defendant had "failed to explain the relevance of these agreements other than to make general assertions that the agreements suggested general compliance with [the defendant's] corporate policy." *Id.* Additionally, the Fourth Circuit recognized the defendant did not offer any evidence to contextualize the number of signed agreements as compared to the total number of employees and, therefore, it found the evidence was insufficient.

Here, the Court also finds the evidence submitted by Suddenlink is insufficient for a reasonable jury to find by clear and convincing evidence that Plaintiff agreed to arbitrate when she had her service installed in 2011. Suddenlink was unable to produce a signed agreement, despite purportedly having technology that captures signatures, and neither affiant has any first-hand knowledge of what transpired between the service technician and Plaintiff.[12] Although Mr. Lucas averred Suddenlink's routine practice is to have customers sign mobile devices prior to services being installed, like noted in *Hill*, it does not mean that the practice is followed every time and does little to prove the existence of a contract that Suddenlink is unable to produce in this case. Clearly, it is not enough to meet West Virginia's high standard of clear and convincing evidence.

*Hill* was different because it was written by a corporate official who was removed from the day-to-day onboarding process of employees.

[12]In this regard, this case is distinguishable from *Gooch* because, although Suddenlink was unable to produce a signed copy of the plaintiff's RSA with Suddenlink, in *Gooch* the plaintiff did not dispute that she signed it. *Gooch*, 2023 WL 415984, at *5. Therefore, the court in *Gooch* found there was no genuine issue of material fact that the plaintiff had accepted the offer by Suddenlink. *Id.*

Therefore, the Court finds Suddenlink has failed to demonstrate that Plaintiff agreed to arbitrate her claim in 2011.[13]

Suddenlink next argues that, even if the Court finds there was no agreement to arbitrate in 2011 when Plaintiff's services were installed, the billing statements sent to her in October 2019 was sufficient to create an agreement. This billing statement provides on page 2, in part: "**Payment Information** Please allow up to 3 days to process your payment once it is received. Payment of your bill confirms your acceptance of the Residential Services Agreement, viewable at suddenlink.com." *Billing Statement*, at 2 (Date due Oct. 12, 2019) (bold original), ECF No. 18-4, at 18. Suddenlink argues that this statement is sufficient to create a binding contract under the second scenario outlined by this Court because Plaintiff continued to pay her bills, was informed that her payments confirmed acceptance of the RSA, and she was provided a link to access and review the RSA with the arbitration provision. The Court agrees.

Under West Virginia law, a unilateral contract is created "where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise[.]" *Cook v. Heck's Inc.*, 342 S.E.2d 453, 458 (W. Va. 1986). The West Virginia Supreme

---

[13]The Court rejects Plaintiff's argument that she entered into an unwritten agreement with Suddenlink in 2011 that included "core deal terms." Plaintiff asserts the "core deal terms" only included her assent to Suddenlink installing her services and her agreement to pay for those services. As this "implied" agreement did not include the RSA, Plaintiff insists the transaction falls under scenario three in which Suddenlink could not modify the terms of their agreement through its billing statements. Although Plaintiff relies upon the Restatement of Law, Consumer Contracts, § 2, Comments 2-4 drafted in 2022 to support her "core deal terms" theory, she cites no cases that have applied it or any cases in which it has been adopted either by the West Virginia Supreme Court or the Fourth Circuit. As this Court must apply West Virginia contract law, the Court finds Plaintiff has failed to establish that the parties entered into an unwritten agreement for only "core deal terms" in 2011.

Court has recognized that it is firmly established "an acceptance may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror[.]" *First Nat'l Bank v. Marietta Mfg. Co.*, 153 S.E.2d 172, 176 (W. Va. 1967). Additionally, general contract principles apply and, under West Virginia law, it has long been held that a contract is formed when there "are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." Syl. Pt. 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 131 S.E. 253 (W. Va. 1926) (cleaned up).

In *Citizens Telecommunications Co. of W. Va. v. Sheridan*, 799 S.E.2d 144 (W. Va. 2017), the West Virginia Supreme Court applied this standard to determine the enforceability of an arbitration provision that was added by an internet provider to its Terms and Conditions. When the subscribers signed up for service, the Terms and Conditions did not contain an arbitration provision, but there was a provision that permitted the internet provider to change the agreement upon giving notice to the subscribers. *Id.* at 70. Ultimately, in September 2011, the internet provider informed its subscribers in their billing statements that it was modifying the Terms and Conditions to add an arbitration provision. *Id.* In January 2012, the internet provider included with their billing statements a notification that it was revising the arbitration provision, and in November 2012 it placed a paper copy of the revised Terms and Conditions with the arbitration provision in their billing statements. *Id.* at 71. When the subscribers filed a putative class action over alleged deficiencies with their services, the internet provider moved to compel arbitration, which the circuit court denied. *Id.*

On appeal, it does not appear that that the competency of the parties or the legality of the subject matter was contested, but the West Virginia Supreme Court did address whether there was mutual assent and valuable consideration to create a binding agreement. Turning first to mutual assent, the West Virginia Supreme Court rejected the subscribers' argument that there was no mutual assent for the modification. The West Virginia Supreme Court found the subscribers did not contest that they received the billing statements with the notices or argue that they did not have access to the Terms and Conditions. *Id*. at 74-75. Given the circumstances, the West Virginia Supreme Court found the subscribers were given reasonable notice of the unilateral contract and the internet provider "was entitled to rely on its customers to read information circulated to them, particularly when a paper copy of the Terms and Conditions was included in the November 2012 billing statement." *Id*. at 74. By continuing to receive services, the West Virginia Supreme Court held that the subscribers "assented to the changes . . . after the reasonable notice was provided." *Id.* at 75.

Turning next to the issue of whether valuable consideration existed, the West Virginia Supreme Court noted consideration is defined when "some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another. A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract." *Id*. at 75 (quoting *First Nat'l Bank*, 153 S.E.2d at 117 (internal quotation marks and other citations omitted). Additionally, the West Virginia Supreme Court stated a modification of an agreement cannot be supported by the original consideration. There must be new consideration. *Id*. Under the facts before it, the West Virginia Supreme Court found that the parties' "mutual commitments to arbitrate alone constitute sufficient consideration

to support the contract" and the modification was supported because the internet service provider had agreed to "additional burdens while providing its customers with additional benefits." *Id*. (footnote, internal quotation marks, and citation omitted). Therefore, the West Virginia Supreme Court held "the September 2011 and January 2012 modifications were supported by adequate consideration." *Id*. Ultimately, the West Virginia Supreme Court further concluded that the internet provider "presented its Terms and Conditions as a condition of providing Internet service to customers, and [its] customers accepted those Terms and Conditions by using and paying for that Internet service, forming a unilateral contract." *Id*. at 73.

Relying upon *Sheridan*, in part, the United States District Court for the Northern District of West Virginia in *Frashuer v. Altice USA, Inc.*, Civ. Act. No. 2:21-17, 2023 WL 195523 (N.D. W. Va. Jan. 17, 2023), granted a motion by Suddenlink to compel arbitration. In that case, the plaintiff challenged a fee on his bill under the West Virginia Consumer Credit Protection Act, and Suddenlink moved for arbitration. 2023 WL 195523, at *1. In support, Suddenlink pointed to the plaintiff's billing statements that, similar to this case, expressly provided: "Payment of your bill confirms your acceptance of the Residential Services Agreement, viewable at suddenlink.com/terms-policy." *Id*. In enforcing arbitration, the Court relied upon *Sheridan* in finding Suddenlink "offered its terms and conditions through its billing statement and corresponding website, and [the plaintiff] accepted [Suddenlink's] terms and conditions by continuing to use and pay for [Suddenlink's] services." *Id*. at *2.[14] As the plaintiff paid for services from Suddenlink, the district court found there was consideration and "a valid, enforceable

---

[14]Although there is no mention of a paper copy of the bill being included with the billing statement in *Frashuer* as was the case in *Sheridan*, the district court found the fact the billing statement combined with the website link was sufficient to create a binding agreement. *Id*. *2.

contract." *Id.* Shortly after *Frashuer* was decided, the Court of Appeals of Arkansas reached a similar result in *Altice USA, Inc. v. Johnson*, Civ. Act. No. 21-31, 2023 Ark. App. 120 (Ark. Ct. App. March 1, 2023), in which it held the plaintiff's "payment of the invoices that she received from Suddenlink, which directed her to the RSA available on Suddenlink's website, manifested her assent to its terms, and the arbitration provision otherwise appears in writing on Suddenlink's website and is supported by mutuality of obligation." 2023 Ark. App. 120, **17-18; *see also Leeper v. Altice USA, Inc.*, 722 F. Supp.3d 893, 900 (W.D. Ark. 2024) (finding that "payment of the monthly billing statements [from Suddenlink], coupled with the RSA satisfy the essential elements of a valid and enforceable contract"); *Lopez v. Cequel Commc'n, LLC*, Civ. Act. No. 2:20-02242-TLN-JDP, 202 WL 5112982, *4 (E.D. Cal. Nov. 3, 2021) (noting that the plaintiff did not deny receiving billing statements from Suddenlink indicating her payment confirmed acceptance of the RSA and holding that these "statements alone are arguably enough to put Plaintiff on inquiry notice of the terms of the RSA, including the arbitration provision").

In light of these cases, the Court finds that an agreement was made when Plaintiff paid her bill after receiving her October 2019 statement. The billing statement expressly stated that Plaintiff was agreeing to the RSA by paying her bill. The billing statement also provided Plaintiff a link to Suddenlink's website where she could find and review the RSA before payment was made. At that time, the following language was prominently displayed in bold and all capital letters on the first page of the RSA found on the website: "**THIS AGREEMENT CONTAINS A BINDING ARBITRATION AGREEMENT THAT AFFECTS YOUR RIGHTS, INCLUDING THE WAIVER OF CLASS ACTIONS AND JURY TRIALS. THE AGREEMENT ALSO CONTAINS PROVISIONS FOR OPTING OUT OF**

**ARBITRATION. PLEASE REVIEW IT CAREFULLY.**" 2019 *RSA*, at 1, ECF No. 10-3, at 38. The Court finds that, by paying her bill and not taking any steps to opt out of the arbitration provision, Plaintiff accepted the RSA's terms and conditions, including the arbitration provision, and a valid, enforceable contract was formed.

As this Court stated in its earlier Memorandum Opinion and Order, if Plaintiff entered into a contract with Suddenlink in 2019 under the second scenario, the email sent to Plaintiff on June 14, 2022, "unmistakably notified [her] it was amending the arbitration provision effective July 20, 2022, and it provided [her] a hyperlink to access the provision." *Lane*, 2024 WL 780440, *5 (citation omitted). Given this clear notice of the amendment, the Court finds that the July 20, 2022 RSA is the operative agreement.

Plaintiff further argues that, if the Court finds there is an operative RSA with an arbitration provision, the Court should allow further briefing to address unconscionability on the precise version of the agreement at issue. Although the parties preemptively made arguments about unconscionability, the Court agrees with Plaintiff that both sides should be able to narrow and focus their arguments to the agreement that went into effect on July 20, 2022.

**IV.**
**CONCLUSION**

Accordingly, for the foregoing reasons and in light of the fact additional briefing is necessary on the issue of unconscionability, the Court **DENIES WITHOUT PREJUDICE** Suddenlink's Renewed Motion to Compel Arbitration. ECF No. 31. If Suddenlink chooses to renew its motion with any arguments regarding the enforceability of the 2022 version of the arbitration provision, the Court **DIRECTS** it do so **on or before April 3, 2025**. Plaintiff's

Response shall be due **on or before April 17, 2025**, and any Reply shall be due **on or before April 24, 2025**. In the meantime, this action shall remain **STAYED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        March 20, 2025

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE